Case 24-1298, Eastern District of Arkansas, Rizzi Howard v. Hormel Foods Rizzi Howard v. Hormel Foods, Rizzi Howard v. Hormel Foods, Rizzi Howard v. Hormel Foods, Rizzi Howard v. Hormel Foods, Rizzi Howard v. Hormel Foods, Rizzi Howard v.    I'm going to reserve five minutes for rebuttal. My name is Rizzi Howard and I am representing the estate of Mrs. George Howard Jr. We're asking this court to reverse the summary judgment granted by the district court and to reverse the court's decision to exclude Dr. Adele Shaker, our forensic pathology expert. Summary judgment was inappropriate because there are genuine issues of material fact and dispute, namely Mrs. Howard's cause of death. Mrs. Howard's autopsy report says bronchial pneumonia was her cause of death. Our forensic pathologist noted in his review of the autopsy report that that autopsy doctor did not test Mrs. Howard's electrolytes as part of his examination. Sodium is an electrolyte. Tests of her electrolytes would have revealed Mrs. Howard's blood sodium level. Dr. Shaker also said testing of electrolytes is considered standard procedure for autopsies, but it was not done. The causation issue was specifically addressed by our experts, namely Dr. Martha Flowers, Dr. G. Edward Mallory, in addition to Dr. Adele Shaker. Question from deposition. What is your basis for your opinion that high sodium levels and not bronchial pneumonia more than likely caused Mrs. Vivian Howard's cardiac arrest? Answer. Bronchial pneumonia, I would have to do more research because I believe that they stated her lungs were clear on presentation. And I'm not even sure if they knew she had bronchial pneumonia as an admitting diagnosis. But anyway, the point is she, Mrs. Howard, had a toxic sodium level that most people don't survive when she presented. So that's why I said more than likely it was linked to her cardiac arrest. Okay, I would never, well, go ahead, that's all I want to say about it. You would never what? I would never say that her cardiac arrest was caused by bronchial pneumonia. So your testimony cardiac arrest means her heart stopped, right? Yes. Answer. Question. She passed away. Answer. Yes. Question. That's it. She passed away. She died, right? That's what cardiac arrest means. Answer. Well, it stopped. Yeah. And they got it going. And it stopped again. Question. Answer. Yes. Question. And something had to cause that heart to stop. Answer.   And that would be the cause of death, right?  No. Why not? Question. Why not? Answer. She lived five days after her cardiac arrest. She lived four or five days. And to say that pneumonia was her reason for her cardiac arrest would be a long shot to me. It might have contributed if she actually had pneumonia at that point. Question. You mentioned a minute ago people with a level of sodium of Mrs. Vivian Howard don't survive. Is that what you said? Answer. The majority of them don't leave the hospital alive. Question. I just want to ask you, is it possible that she died? I mean, reading the record, one conclusion that you can reach is that she died because of high sodium levels, but it wasn't Hormel's fault. Is that a possible reading? In other words, nothing I can see. You may be tied to high sodium levels, but you haven't tied it to Hormel. No, that's inaccurate, Your Honor. We've tied it to Hormel, and I will be getting to that point, but I can skip ahead. We have Mrs. Howard's medical record. She was evaluated twice a year at Little Rock Diagnostic Clinic. And as you can see, the sodium normal blood level is between 137 and 145. November 2016, 133. These are her levels from her medical records. May 2016, 137. May 2017, 141. January 2019, 135. Then in July, she was admitted to Baptist Hospital because she choked on food at home, and they implemented or tried these Hormel meals that you see here on the table on a trial basis, but Mrs. Howard was discharged with her regular diet. However, she was on those meals six days prior to her next evaluation, which she had August the 1st of 2019. And for the first time in her medical history, her sodium level was 146, one point above normal. Then on the date of her admission, because in September she was diagnosed with dysphagia, and these meals are advertised as being nutritious and for dysphagic patients. After being on the meals for 26 days, she arrived at Jefferson Regional Medical Center. After going into cardiac arrest four times, they drew her blood, and it was 182. Do you know how many meals Hormel advises, of those meals Hormel advises giving per day? I'm so glad you said that. There is no information, and that is one of our causes of action. There is no warning, and these meals are from 430 to 500 milligrams of sodium each. They're in seven-ounce containers. Mrs. Howard had a hearty appetite. She had two for breakfast, two for lunch, two for dinner. I have added those up. Breakfast, their milk contains 210 milligrams of sodium. The eggs with cheese, potatoes, and bacon, she had two of those, both 420 milligrams of sodium. Lunch, roasted chicken with potatoes and carrots, 430 milligrams. Two for lunch, two for breakfast, two for dinner, six per day. See, that's what I wanted to ask you. To me it feels like, and I'm just going to ask it, and obviously it's terrible what happened to your mom, but if I go and have six pieces of cake or pie a day, I can expect that I'm going to get fat, right? I mean, I'm going to expect if I do that every day. And here, my understanding from the record is there were six meals a day, and the nutritional labels were correct. There were 500 milligrams, but it all added up to a lot of, or whatever it was, it all added up to a lot of sodium if you did it six times a day. So I'm just wondering if it's Hormel's fault that she was given six of those meals a day versus, say, three or four of those meals a day accompanied by something of lesser sodium. This is what you have to understand. Speech therapists at Baptist and hospitals instruct you to use the Hormel meals. There are over 100 different varieties. They have breads, desserts, milks, teas. So it is foreseeable, Your Honor, that a person would have six. People that have had accidents, excuse me. Isn't the whole point of the label on the food to say, I mean, because they don't just tell you there's 500 milligrams of sodium in there. They say the recommended daily allowance is X, and this is a percentage of. And, you know, if you just look at the label and you're saying, man, I'm at like 300%. Your Honor, if you're instructed to use a product, you use it, especially if it's coming from a health care person. That is why we're saying there needs to be a warning. However, they are not, these meals are not regulated by the USDA nor the FDA. They bypass NELA, which is the National Education Labeling Act, which would require these meals to have in large, bold, black print with letters of the same size. But they bypass NELA because it's a generic, texture-modified product. This allows them to bypass approval of the USDA, inspection only. And inspection is not review. This is how they managed to put this out. This product would not, it would not fly unless it were texture-modified, adulterated, and all of these types of things are violations of APALA, the Arkansas Product Liability Act. That's part of the point. We think they need to be, they need to have a warning label, just like with a prescription. It says you have to be warned, it will make you sleepy. Just taking a look at one, you don't get the impression that you'd have up to 500 milligrams of sodium in that. So we don't have any labels. I wonder whether the speech pathologist, to the extent anyone is liable, might be the one who's liable. And I'll tell you why. If you would have gone and, you know, whoever was caring, I think you were caring for giving her 30 of these meals. I know that's an unreasonable number because the speech pathologist told you to give 30 of those meals. That would not be Hormel's fault, I don't think. And so I understand that there was a lot of miscommunication here, but I wonder whether the speech pathologist might have been the better object of the lawsuit rather than Hormel. We have a lawsuit against Baptist as well. I disagree, and this is the reason why. Dysphagic patients are prescribed these meals. They are purchased over the counter through Amazon, Walgreens, Walmart. They don't require a prescription. And so for that reason, it needs to be labeled on the front, especially for people that are on low-sodium diets. If the product were under NELA, they would be required to have the warning. But because they are generic, they're under FSIS, the Food Safety Inspection Service. And FSIS is not under NELA. So that's how they bypass the regulations that NELA would require. I'm sorry because I should ask this when we're talking about Dr. Shachar's opinions. Yes, Judge. You were reading from Dr. Shachar's depositions and statements, right? No, Your Honor. Excuse me if you were confused. That was from Dr. Martha Flowers. She's one of our other experts. And I also have deposition testimony from Dr. G. Edward Mallory, our emergency medical expert. And they all agree that Mrs. Howard died from hypernatremia, which is also known as sodium poisoning, high blood sodium. So that is where the discrepancy comes in. And we do have proof. It is Hormel's fault because they are strictly liable when it comes to warning labels, at least under APALA, the Arkansas Product Liability Act. One of your issues on appeal was that Dr. Shachar was improperly excluded. Yes, Your Honor. And I'm just looking at, you know, and that was based on Rule 26, right? I think that's what, well, that's what the order says. That's what the judge says, right? And if you look at it, I mean, the judge says no opinion in it. And I'm reading the letter and I'm trying to figure out, is there an opinion in there? Because it seems mostly like a series of factual statements and then no opinion as to what it does or doesn't do. Well, he's not a retained expert. And in addition, you know, Rule 26 is about discovery. And in my deposition, I gave information about Dr. Shachar. The main reason we have Rule 26 is so there are no surprises and you know what the expert witness is going to say. But when it comes to an autopsy, basically all you can do is relate facts. You know, it's unlike the treating doctors. And the treating doctors all stated that she had hypernatremia, which leads to seizures, coma, and death. Okay. Any other questions before I continue, Your Honors? You're into your rebuttal just to let you know. So if you want to reserve, you can. If you want to keep going, you're welcome to do that as well. Okay. I still want to reserve some time. Let's see. So I have 2.26 minutes. You've got two and a half minutes left. Okay. Let me see if there's anything else I want to focus on. Oh. In the beverages, patients, and it says it on the can, are instructed to use two tablespoons of the mixture in every glass of eight ounces of water. And that totals, Mrs. Howard was kept well hydrated with four glasses of water per day. And that totals half a cup of salt, which is what is explained here. What is that? What was her maximum, given her age and medical condition, what was the maximum amount of sodium that the medical experts said she should have had? That would be basically what every average adult should have. According to the American Heart Association, it's recommended 1,500 milligrams. And just from the products alone, the meals and the milk with breakfast are equivalent to 2,890. That does not include the half a cup of sodium from the mixture that is put into every eight-ounce glass of water. Our other evidence relates to Mrs. Howard's kidneys, and the evidence medically from her records show EGFR, which is the desired range. EGFR shows how well the kidneys are functioning, filtering substances through the body. And what is desired is an EGFR of greater than 60. And going over Mrs. Howard's medical records prior to the introduction of these meals, in 2016, the first office visit, 78.53. In May of the same year, 78.62. In May of 17, 78.44. And then you'll see a drastic decrease on August 1st, which is after the meals were introduced for six days in July, when Mrs. Howard was a patient at Baptist. When she had her next office visit for the first time, her EGFR was at 66.91. On October 15, after having been on the meals for 26 days, her EGFR upon arrival at Jefferson Regional Medical Center is less than 25, and her blood sodium was over 182. Any other questions? Thank you. Thank you, Mr. Jackson. May it please the Court, my name is Andrew Jackson. I represent Hormel Foods Corporation. We respectfully request that this Court affirm the ruling of the District Court granting Hormel Foods summary judgment on all counts in this case. The District Court correctly concluded that the manufacturing defect and breach of warranty claims were subject to dismissal because plaintiff did not produce evidence of a defect in the Hormel Foods products. That is a level of sodium that is unreasonably dangerous to the plaintiff. This can be done two ways, through direct evidence or, as plaintiff does it, through res ipsa loquitur theory. There is no dispute that there is no direct evidence that these Hormel products contain excessive levels of sodium. Instead, the plaintiff argues in her briefing that Ms. Vivian Howard's death is the evidence of defect in the product. In order to proceed without direct evidence, which can be done, she must produce substantial evidence to negate other potential causes of death. And she can't do that in this case. Ms. Vivian Howard had numerous medical conditions, but primarily the autopsy report done by the forensic pathologist that plaintiff hired after Ms. Vivian Howard's death concluded that the cause of death was bronchopneumonia. Plaintiff has offered three experts in order to negate with substantial evidence that bronchopneumonia was the cause of death. Dr. Shaker was appropriately excluded, as Judge Erickson pointed out, because his expert report does not disclose any opinions. I think in her argument, she says that the standard for the autopsy report was to test for electrolytes, and Dr. Shaker's report doesn't say that. It just lists that electrolyte testing was not done. Did the district court, did the judge get it right when he relied on the expert disclosure rule? Or should the district court have alternately said there's just no expert opinion in Dr. Shaker's report? I think both. I think the Rule 26 and Rule 702 must be followed. And Rule 26 requires disclosures of all opinions. We're not to have to guess at what the opinions are going to be at trial. And then without any opinions, we can't determine whether they're reliable under 702. So I think they're excludable on both counts. She also offers Dr. Flowers to negate bronchopneumonia as a cause of death. Dr. Flowers testified at her deposition that she did do a differential diagnosis, and she could not rule out other causes of death. Furthermore, when asked specifically why she concluded that hypernetremia and not bronchopneumonia was the cause of death, she said, I'd have to do more research. And respectfully, the time to do more research is before offering our causal opinion and not after. Similarly, Dr. Mallory was deposed. And at his deposition, he was asked what was the cause of death. And he acknowledged that it was multifactorial, including pneumonia. So all three of the experts could not negate bronchopneumonia as a cause of death. Accordingly, the district court correctly concluded that the manufacturing defect and breach of warranty claims were subject to dismissal under summary judgment. Police failure to warn law allow a products case to go forward on a substantial contributing factor, cause of death theory, or does it require that it be a more direct cause than that? I think Arkansas law requires a more direct cause, but that would go to proximate causation, which is another element. We're talking about defect under a residency theory, which is under common experience. The death of a 93-year-old woman doesn't happen without hypernetremia. In the absence of negligence. Yeah. So I would say that's a different analysis. Her failure to warn claims also fail as the bench discussed earlier. All the products at issue contain the level of sodium in the product and the percentage of the daily nutritional value. Which, just as a correction, I believe it's 2300, not 1500, is the denominator for the recommended intake level. But this makes sense with food products, because as Plaintiff acknowledges in her briefing, a lot of different people eat these products. It could be professional athletes, the elderly, the young. And each one is going to have different dietary needs and nutritional needs. So they need to be able to develop and evaluate which food products they need to eat in order to get their appropriate needs met. And I think Hormel offers over 100 of these products. And the intent is to allow different people with different nutritional needs to eat different products to make sure they're meeting all their needs. Hormel can't anticipate what every single consumer of the product is going to need as far as their nutrition. But they do what they have to on the nutrition label by saying, here's how much sodium's in it, and here's the recommended. Is there evidence in the record who the primary target is for this product? Yes, Your Honor. The affidavit of Tim Gary is on the record, and the primary target is individuals with dysphagia. So that would be Mrs. Howard? Yes, Mrs. Howard was an individual with dysphagia. So to say that there's athletes or young people, really the primary category, however, she falls into. And so I guess you ask the question, well, was there any obligation to put any information on the label because folks with that particular disorder may have higher risks? Yes, and I should clarify, there's no evidence in the record that professional athletes or children or anyone else has dysphagia. That was an argument in Plaintiff's brief that she says that athletes can have dysphagia, young people can have dysphagia, old people can have dysphagia. It's just different kinds of people. I wonder why this product is different, and maybe it's because of regulation, but when you see Tylenol, for example, it'll say, don't do more than eight of these in a 24-hour period. I'm kind of making that up, but I remember seeing that on the bottle. I'm just wondering whether there's some obligation here to do something similar. As Tylenol doesn't say, don't eat more than five of these meals a day or whatever that number may be. And I just want to give you a chance to respond. Yes, while this product was recommended by the speech therapist for an individual with dysphagia, it's a food product. It's sold in the grocery aisles and not the pharmacy. And so based on the nutrition label, you might want to eat more or less. And there is no requirement that I'm aware of from the FDA or USDA, which are the controlling regulatory schemes for these products that would require a food product like this to have such a warning. And yet it's a food product with a Tylenol-like aspect to it, though, right? Because it is targeted toward people with the physical problem. It's not just like going on the shelves, and so you see the can of Pringles with all of the sodium, and maybe we don't require don't eat more than three cans a day or something. But here you've got somebody who is actually eating them for a medical purpose. So to call it entirely just a food product doesn't quite capture it, does it? I think under the regulatory scheme, it is not regulated in the same way as Tylenol, so it's more akin to a food product than to Tylenol. But I understand your meaning. It's designed for a certain person. But what plaintiff is asking, and this gets to the failure to warn claim a little bit, is that a warning go on the product that says this product, if consumed with other products, or if you consume X number, which I don't know what X number is, that you could have it lead to hypernatremia. And I think that would lead to kind of an absurd result in this case, because every product for people with dysphagia would require a similar warning, and it probably would require a similar warning for every nutrient. Too much sugar, if you eat too much sugar, you could cause high glucose level. And that's just hard to manage when you're dealing with different people with different issues. There are other alternatives to these particular meals, right? I mean, if you look at people with dysphagia, they eat pureed foods. So you can make a regular meal. You can throw it in your blender and puree it. You can eat that. You can eat baby foods. You can thicken foods with tapioca starches of all sorts that are low in sodium. I mean, there are other alternatives. It's not quite like, listen, finding a liver-sparing antipyretic is almost impossible to find. Whereas with this, I mean, there's all kinds of things that, baby foods being the most, just the primary example, I mean, those things are all relatively low in sodium because children are susceptible to sodium overdose as well, right? Yes, that's absolutely your honor, and that's kind of my point when I get to you. There was even a Hormel, in addition to baby food and pureeing food at home and other options that you have, Hormel offered 100 other products with different levels of sodium and different nutrition levels that could have been chosen as options to create a balanced diet in this case. So yes, there are other ways to do it, to make sure that you can manage your levels of sodium or other nutrients that you need. How does this compare, and maybe there's nothing in the record on this, to things like TV dinners, lean cuisines, and stuff like that? Because I know that there are other products that are made ready to eat where you throw it in the oven or in the microwave, and they are very high in sodium, lean cuisines in particular. Yeah. These products are considered meal-like products, so similar to your TV dinners. And as we talk about in our brief, and the affidavit of Radon Rao, these meal-like dinners have, the USDA has set a standard for labeling these products as healthy. Healthy requires a lot of things, but for purposes of sodium content, healthy for these meal-like dinners is less than 600 milligrams of sodium. So these products, all four of these products that were consumed, were under that level. So for purposes under the USDA regulations, for purposes of meal-like dinners like these, these are considered healthy and not unreasonably dangerous. I think, I don't know exactly how much is in the TV dinners, but they're higher. I would say they don't qualify. I'd just point out that I'm not aware of any cases, and Plaintiff has not identified any cases. I have identified that the high levels of sodium is defective, or any cases that require the warnings that Plaintiff is asking for as well. This is kind of novel. And I'll also touch on briefly, the District Court correctly granted summary judgment on the negligence claim as well. There's no evidence of anything Hormel did. There was no deposition taken. There were no documents requested. There's no evidence that Hormel did breach any duty of care in the manufacturing or formulation of these products. So these products were reviewed by registered dietitians before they went to the market. And in 10 years of them being on the market, they've never been subject to USDA or FDA enforcement action related to levels of sodium. Furthermore, for the negligence and product defect that I discussed earlier, the res ipsa locator, the thing that speaks for itself, that analysis applies to both, and the Plaintiff is required to negate other potential causes, so it fails for that reason as well. Briefly, to address a couple of Plaintiff's arguments, Dr. Shaker was retained. She referred to him multiple times as an expert report, and he wasn't involved in this case. He reviewed documents, so he was a retained expert and subject to those requirements. Also, a few arguments that were raised in the appellant's reply brief, and I would just like to briefly touch on forfeiture. New arguments such as, for example, the argument that Ms. Radon Rao or Mr. Tim Gary should be excluded, that's not properly before the court, and those were excluded, or should be deemed forfeited. Finally, I would like to, many facts in Plaintiff's brief and argued today are conclusory and lack record support, and this court has concluded that a fact has to have record support, or else it will be discarded, so I just ask that the facts that do not have record support be disregarded in this case. That's all I have, unless the court has any more questions for me. I see none. Thank you very much. Ms. Howard, I think you used up all your time, but we'll give you a couple of minutes if you would like it. Yes, thank you. First of all, counsel has said that these meals are nutritious. Only NELA can state when a product is nutritious, and they are not under NELA. They are actually making false claims by saying the meals are healthy. The regulating body for nutrition is NELA, and they are under FSIS, which is not under NELA. The testimony of Dr. Flowers, I did not get a chance to finish reading. She stated that numbers like hers concerning Mrs. Howard, that she had probably seen less than five in her entire career of practicing for 44 years, and she said she did not agree with the autopsy. Dr. G. Edward Mallory, he put the finger squarely on the meals themselves. I did not get an opportunity to read from his deposition, but he said that the product was high in sodium content and that this was the main reason or a major contributory factor to why Mrs. Howard arrived in cardiac arrest. Also, the testimony of Tim Jerry, he is a dietician. Ms. Rao has a master's degree. Our experts are all medical doctors, and 702 is what is supposed to be used as far as determining whether or not an expert should be excluded. These meals are used in the hospital. They use them in the hospital, and concerning Judge Erickson's question, we were given a can while my mother was in the hospital to use in her water, and we were told to use the wholemeal products going forward. So it's a little bit different from the meals that you were referring to when you go to the store and you buy food. These products are being recommended by hospitals, used in hospitals, and they are more of a medicinal product, as Judge Kelly mentioned. Thank you. Thank you. Thank you to both counsel for your arguments here today.